**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**KEVIN LEE MAYNARD,**

       **Plaintiff,**

**v.**                                                                              **Case No.: 3:16-cv-10694**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as set forth in their briefs. (ECF Nos. 13, 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment on the pleadings be **GRANTED**, that the decision of the Commissioner be **AFFIRMED,**

and that this case be **DISMISSED,** with prejudice, and removed from the docket of the Court.

## I.     Procedural History

Kevin Lee Maynard, ("Claimant") filed an application for SSI on September 3, 2013, alleging a disability onset date of August 1, 2008,[1] (Tr. at 16), due to "degenerative disc disease, COPD [Chronic Obstructive Pulmonary Disease], GERD [Gastroesophageal Reflux Disease], high blood pressure, seizures [and] substance abuse." (Tr. at 137). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 91, 99). Claimant filed a request for an administrative hearing, which was held on October 16, 2015, before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 610-636). By written decision dated November 25, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 16-27). The ALJ's decision became the final decision of the Commissioner on September 28, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 11, 12). Claimant then filed a brief seeking reversal, or reversal and remand, of the Commissioner's decision, and the Commissioner filed a brief in support of her decision. (ECF Nos. 13, 14). Consequently, the matter is fully briefed and ready for resolution.

---

[1] At the administrative hearing, Claimant suggested amending his disability onset date to November 13, 2013, Claimant's fiftieth birthday, as this date was only two months after the date of his application for SSI. Claimant's counsel explained that Claimant's age and level of education, when combined with an RFC limited to sedentary level exertional work, would direct a finding of disability under the Medical-Vocational Guidelines on Claimant's birthday. However, the ALJ determined that the beginning date for the period under consideration was September 3, 2013, the date of Claimant's application for SSI. (Tr. at 27, 635).

## II.    __Claimant's Background__

Claimant was 49 years old at the time of his application for SSI, and 52 years old at the time of the ALJ's decision. (Tr. at 26). He communicates in English and has a ninth grade education. (Tr. at 136, 138). Claimant's prior employment history includes work as a furniture mover and demolition laborer. (Tr. at 138, 616-618).

## III.    __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity

("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first

three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

Here, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since September 3, 2013, the amended disability onset date. (Tr. at 18, Finding No. 1). At the second step of the evaluation, the ALJ established that Claimant had the following severe impairments: "degenerative disc disease; chronic obstructive pulmonary disease (COPD); seizure disorder; anxiety; depression; and history of alcohol dependence." (Tr. at 18, Finding No. 2). Under the third inquiry, the ALJ determined that Claimant's impairments, both individually and in

combination, failed to meet or medically equal any of the listed impairments. (Tr. at 18-20, Finding No. 3). Accordingly, the ALJ found Claimant to have:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the individual cannot work on ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants and all hazards; can understand, remember, and carry out simple instructions; and can have occasional interaction with others.

(Tr. at 20-25, Finding No. 4). At the fourth step, the ALJ concluded that Claimant was unable to perform any past relevant work. (Tr. at 25, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's age, education, and past work experience, in combination with his RFC, to determine his ability to engage in substantial gainful activity. (Tr. at 26-27, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1963, and was defined as a younger individual on the date the application was filed; but subsequently changed age category to closely approaching advanced age; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because his past relevant work was unskilled. (Tr. at 26, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ found that Claimant could perform jobs that existed in significant numbers in the national economy, including work at the light exertional level as a price marker, package tagger or routing clerk, and at the sedentary exertional level as a table worker, sorter or weigher. (Tr. at 26-27, Finding No. 9). Accordingly, the ALJ concluded that Claimant had not been under a disability since the date the application was filed. (Tr. at 27, Finding No. 10).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence for two reasons. First, Claimant asserts error in the ALJ's finding that Claimant

was capable of light level exertional work. Claimant cites to various pieces of evidence, which he believes conclusively demonstrate that he is physically and mentally unable to do more than sedentary level work. (ECF No. 13 at 5-7). Claimant contends that this error by the ALJ is not harmless, because if the ALJ had found Claimant's RFC to be limited to sedentary work, the Medical-Vocational Guidelines (the "Grids") would have directed a finding of disability. *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 2.

Second, Claimant argues that the Appeals Council erred by failing to properly consider new and material evidence submitted after the ALJ's decision. Claimant indicates that he provided the Appeals Council with reports and RFC assessments from two additional examining medical sources, who opined that Claimant was not capable of performing the work identified by the ALJ in the written decision. Claimant is critical of the Appeals Council's apparent inability to recognize the importance of these medical source opinions, and its failure to explain why the additional evidence does not provide a basis for further review. (ECF No. 13 at 7-8).

In response, the Commissioner claims that the ALJ conducted a thorough assessment of Claimant's RFC and based her determination that Claimant could perform light level work on the evidence of record, which substantially supported such a conclusion. The Commissioner further states that the written decision fully explains the ALJ's finding and demonstrates why the evidence does not establish that Claimant has a more restricted RFC. (ECF No. 14 at 14-17). With respect to Claimant's criticism of the Appeals Council, the Commissioner emphasizes that the Council is not required to provide an explanation for its assessment of the new and material evidence. In addition, the Commissioner discusses weaknesses in the supplemental medical source statements and argues that the statements failed to offer sufficient facts and findings to justify the

opinions expressed by the medical sources. (*Id.* at 17-20).

## V.    **Relevant Medical History**

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following summary is limited to the evidence most relevant to the issues in dispute.

### A. Records of Treatment Rendered More Than One Year Before Alleged Disability Onset

At the administrative hearing, Claimant produced medical records and consultations from a prior disability determination that resulted in a March 2012 denial of Claimant's application for SSI. Because the ALJ reviewed and considered these documents, and they were made part of the record, the undersigned likewise addresses them.

On January 19, 2011, Claimant presented to Amy Marsteller, M.D., at the Carl Johnson Medical Center, to establish care for complaints of back pain, which had been ongoing since a 1987 back surgery. (Tr. at 526-28). Claimant described the pain as starting in the lumbar area and radiating into the back of his left leg, and the pain was associated with weakness in the leg. Claimant took 800 mgs. of Advil for pain relief, generally without improvement. However, he reported that in the past, he had a prescription for Robaxin, which did alleviate the pain. Claimant also told Dr. Marsteller that he had anxiety manifesting in constant worry, feeling sad and "on edge," and having sleep disruption. He denied suicidal or homicidal thoughts. Claimant provided a positive history for smoking two packs of cigarettes a day and drinking six to eight alcoholic beverages a day.

On examination, Dr. Marsteller noted diffuse tenderness of Claimant's lumbar

spine and 4/5 strength in his lower extremities. She diagnosed Claimant with lumbar radiculopathy and anxiety. Dr. Marsteller ordered an MRI of Claimant's spine and prescribed Cymbalta for treatment of his anxiety, advising him that Cymbalta might also offer relief of his chronic back pain.

On February 4, 2011, Claimant presented to Cabell Huntington Hospital for an MRI of the lumbar spine. (Tr. at 489-91, 504-06, 523-25). The MRI revealed degenerative changes, most pronounced at the L4-5 level, where they were superimposed on congenital spinal canal stenosis. To the right of midline and anterior to the thecal sac, a small amount of epidural scarring was seen that was most likely related to Claimant's prior back surgery. A 5 x 5 x 3 millimeter extrusion of disc material appeared to the left of midline just at and above the level of the L4-5 disc. The fragment, along with anterior and posterior degenerative changes, and congenital spinal canal stenosis produced a high grade acquired spinal canal and left lateral recess stenosis. Impingement on the left L5 root, or other more inferior nerve roots on the left, was possible. Given the severity of the MRI findings, a neurosurgical referral was recommended.

On February 17, 2011, Claimant was examined by Matthew Werthammer, M.D., at St. Mary's Neurosurgery. (Tr. at 498-503). Claimant provided a treatment history of back surgery, physical therapy, oral steroids, non-steroidal anti-inflammatory medications, and pain medications. He currently was taking Lortab, Ibuprofen, Cymbalta, Nexium, and Robaxin. Claimant's medical history was also positive for lung problems, seizures, and depression. He admitted to smoking two packs of cigarettes per day, using illicit drugs, and drinking alcohol, stating that he drank "to [sic] much." Claimant's review of systems was positive for lack of energy, fatigue, weakness, headaches, dizziness, profuse sweating, night sweats, dental problems, fast irregular heartbeat, leg pain when walking, and

9

frequent nocturnal urination.

On examination, Claimant appeared healthy and in no acute distress. He was alert and oriented to person, place, and time, demonstrating an intact memory and the ability to follow complex commands briskly. Claimant had no audible carotid bruits, and his peripheral pulses were normal. He demonstrated full cervical and lumbar range of motion with no evidence of paraspinal muscle spasm, point tenderness, or bony step-offs. Claimant's upper and lower extremity strength was 5/5, and his muscle tone and bulk were normal. His deep tendon reflexes were 2+/4 throughout his upper and lower extremities bilaterally, with the exception of the Achilles tendons, which were trace bilaterally. Claimant had no ankle clonus, and the Hoffmann's sign was absent. His cerebellum was benign; he had normal cadence and arm swing; and straight leg raise testing produced back pain, but not leg pain. Dr. Werthammer reviewed the MRI of Claimant's lumbar spine, noting diffuse multilevel degenerative changes, evidence of prior back surgery at L4-5, and a central disc protrusion at that level. Although the MRI also showed some epidural scarring producing central canal and foraminal narrowing, with milder disease at L3-4 and L5-S1 levels, Dr. Werthammer found Claimant's spinal alignment to be normal. Dr. Werthammer diagnosed Claimant with degenerative lumbar spinal disease and long-standing axial low back pain, without radicular leg pain. Because Claimant did not have radicular leg pain, Dr. Werthammer believed conservative treatment, rather than surgery, was the most prudent treatment option. In a letter to Dr. Marsteller, Dr. Werthammer stated that he was doubtful a "specific lumbar spine operation would satisfactorily alleviate [Claimant's] long standing chronic back pain." He gave Claimant a prescription for physical therapy and referred him to the pain clinic for possible epidural injections. Claimant was encouraged to exercise and stop smoking.

Claimant returned to Dr. Marsteller on March 2, 2011, for follow up of his back pain. (Tr. at 520-22). Claimant confirmed that Dr. Werthammer did not recommend surgery and, instead, prescribed physical therapy and medications. Claimant was currently taking Lortab for pain relief, adding that Cymbalta seemed to be helping control his anxiety. Dr. Marsteller advised Claimant to participate in physical therapy and continue taking Cymbalta.

On March 11, 2011, Claimant presented to St. Mary's Pain Relief Center to begin treatment with David Caraway, M.D. (Tr. at 378-85, 444-51, 466-76, 507-08). Claimant reported suffering a back injury twenty-four years earlier, which required surgical intervention. He did well post-surgery until the last two to three years. Despite having suffered no new injury, Claimant complained of having increased low back pain that was constant, severe, and radiated over his left hip and down his left leg with some left leg numbness. Claimant indicated that he felt pain when he coughed, sneezed, moved forward, moved backward, or bent over. Claimant rated his pain as five to six on a ten-point pain scale and described the pain as burning, stabbing, throbbing, and tingling. (Tr. at 468). His back pain increased with sitting, standing, lifting, walking and changes in the weather, but decreased with heat, analgesics, position changes, and rest. (Tr. at 469). On a review of systems, Claimant also complained of depression, anxiety, panic attacks, difficulty breathing through his nose due to prior removal of cartilage, GERD, coughing linked to smoking cigarettes, and seizures, the last one occurring twenty years prior. (Tr. at 470). Claimant completed a symptoms list, noting the presence of restless sleep, restless leg syndrome, leg cramps during sleep, nocturnal urination, depression, trouble with his memory, sinus issues, vivid dreams, nightmares, and chronic pain. Claimant admitted to smoking one to two packs of cigarettes a day and drinking three to four

alcoholic beverages a day. (Tr. at 475).

On examination, Dr. Caraway found Claimant to be in no acute distress, awake, alert, and oriented. He weighed one hundred forty-eight pounds with a blood pressure of 123/69. Claimant walked with an antalgic gait, rose from his chair slowly, and had to hold on to the counter in order to squat. (Tr. at 507-08). Claimant could forward flex to approximately thirty degrees and extend to approximately ten degrees. A straight leg raise test caused left hip and leg pain when in the seated position with eighty degree extension of the knee, but was negative on the right side. Claimant's deep tendon reflexes were 1+ and symmetrical at the patellar level, with no clonus or spasticity noted. Dr. Caraway diagnosed Claimant with lumbar spinal stenosis, lumbar radiculopathy, and post laminectomy syndrome. As the recent MRI showed degenerative changes and congenital spinal canal stenosis, Dr. Caraway recommended that Claimant undergo a series of epidural injections and begin taking Lyrica, as well as hydrocodone for pain relief. Claimant returned to St. Mary's Medical Center on April 26, 2011 for a transforaminal lumbar epidural steroid injection administered by Dr. Caraway. (Tr. at 444, 481-82, 488).

Two days later, on April 28, Claimant saw Dr. Marsteller for ongoing sleep disruption and for a refill of Robaxin. (Tr. at 519). Claimant told Dr. Marsteller that he had received an epidural steroid injection two days earlier, but was not getting much pain relief. Claimant also reported that he had stopped taking Cymbalta because it caused him to experience a panic attack. Claimant described feeling on edge and irritable. Claimant was given prescriptions for Robaxin, Cymbalta, and Elavil and was advised to stop smoking.

On July 5 and August 2, 2011, Claimant presented to Dr. Caraway for transforaminal lumbar spinal epidural steroid injections. (Tr. at 444-45, 477-80, 486-87).

Each time, Claimant tolerated the procedure well with no complications. Claimant returned to St. Mary's Pain Relief Center on September 13, 2011 and was see by a Physician's Assistant ("PA"), Jessica Rulen-Riddle. (Tr. at 440-444, 460-65, 483-85). Claimant told PA Rulan-Riddle that he had received three epidural injections: the first provided a little pain relief for one or two days, the second provided him thirty to forty percent pain relief for two weeks and the third injection provided him with sixty percent pain relief. Claimant stated that he had fallen the prior month when his right leg gave out on him. In addition, his anxiety had increased, and he experienced left arm and hand numbness. (Tr. at 460). PA Rulan-Riddle noted that Claimant had full range of motion in his upper extremities; however, lower extremity range of motion had decreased to seventy degrees. (Tr. at 460-61). Claimant rated his pain as six out of ten, describing it as constant, sharp, aching, and radiating. On examination, Claimant demonstrated minimally decreased range of motion of his left lower extremity with a positive straight leg raise at seventy degrees. (Tr. at 463-64). Claimant showed no focal deficits, but his gait was minimally antalgic. PA Rulan-Ridlle assessed Claimant with post laminectomy syndrome of the lumbar spine and left-sided radiculopathy. She documented that although Claimant was aware of the Pain Center's narcotic policy, he did not bring his Lortab prescription to this visit. A drug screen was administered that subsequently returned positive for amphetamines, opiates, hydrocodone, and hydromorphone. (Tr. at 483-85). Claimant was provided prescriptions for Lortab and Lyrica, in addition to Vistaril for treatment of anxiety, and he was asked to sign a narcotics contract. An appointment was arranged for Claimant to see the Pain Center psychologist for further evaluation of anxiety. As for his sleep issues and neck pain, Claimant was to follow up with his primary care physician, who prescribed Elavil.

Claimant returned to Dr. Marsteller's office on October 4, 2011. (Tr. at 518). Claimant reported having received epidural injections; however, the last one he received did not provide any improvement for his low back pain. As for his anxiety, Claimant told Dr. Marsteller that he was not taking Cymbalta as he felt the only medication he required for this condition was Vistaril. On examination, Claimant weighed one hundred fifty-one pounds and had a blood pressure of 130/80 and an oxygen saturation of ninety-seven percent. Dr. Marsteller diagnosed Claimant with low back pain, GERD and anxiety. He was instructed to continue with treatment at the St. Mary's Pain Relief Center, take Nexium for treatment of GERD, and continue taking Vistaril for treatment of anxiety. Claimant was scheduled to attend a psychological appointment at the St. Mary's Pain Relief Center on October 17, 2011; however, he failed to appear for the appointment. (Tr. at 377, 452).

Claimant returned to Dr. Marsteller two more times in 2011: October 28 and November 28. (Tr. at 516-17). On October 28, Claimant complained of severe headache and neck pain. He also reported a knot on his forehead that was enlarging. On examination, Claimant weighed one hundred fifty-eight pounds and had a blood pressure of 154/100. Dr. Marsteller diagnosed Claimant with COPD, headaches, and increased blood pressure. On November 28, Claimant reported a rash on his feet, face, and neck that he attributed to a medication reaction. Claimant told Dr. Marsteller his anxiety was uncontrolled, although with the use of medication (Spiriva), his breathing felt "more normal." Dr. Marsteller diagnosed Claimant with anxiety, COPD, hypertension, and alcohol abuse. She counseled Claimant on his excessive use of alcohol, but Claimant replied that he "was not ready to quit." Claimant was provided prescriptions for treatment of hypertension in addition to Celexa, Spiriva, and Ventolin.

14

On December 9, 2011, Claimant returned to the St. Mary's Pain Relief Center. (Tr. at 435-39, 453-59). Since his original consultation, Claimant had undergone three epidural injections for treatment of back pain. Claimant estimated he had received sixty percent benefit after the first two injections, but felt the third injection made "his back worse." On examination, Claimant's blood pressure was 134/84; he weighed one hundred fifty-six pounds; and he was alert, oriented, and in no distress. PA Ashley Clay observed that Claimant walked with an antalgic gait. On examination, Claimant showed pain mannerisms with movement of the cervical and lumbar spines. His straight leg raise test was positive bilaterally, left greater than right, measuring sixty degrees in a seated position. Claimant also exhibited pain mannerisms when moving his lower extremities and had a minimally decreased range of motion of the left lower extremity. He had tenderness over the cervical, thoracic, and lumbar regions. PA Clay assessed Claimant with post laminectomy syndrome of the lumbar spine and left sided radiculopathy. She noted that Claimant had seen Ken Devlin at the St. Mary's Pain Relief Center for a psychological evaluation. Mr. Devlin felt that Claimant displayed a high level of somatic and functional complaints in addition to depression. Mr. Devlin found Claimant's reports of depressive thoughts and feelings to be ninety-two percent higher than those seen in other patients. Mr. Devlin added that "this level of depression [could] impede physical rehabilitation and recovery." Claimant's anxiety level was found to be average.

### B. Records of Treatment Rendered During the Period Beginning One Year Prior to Alleged Onset of Disability

Claimant returned to St. Mary's Pain Relief Center three times in 2012: September 25, November 20, and December 10. (Tr. at 324-45, 348-53, 356-68, 372-76). At his September 25 visit, Claimant complained of difficulty getting out of bed due to severe hip

pain. He reported his last epidural injection made his back feel worse, so no additional injections were scheduled. Claimant received trigger point injections for complaints of myofascial pain in July, which according to Claimant, "worked wonderfully" to relieve his pain and continued to do so. On examination, Claimant's straight leg raise test was positive, with associated pain mannerisms on movement, but his cervical thoracic spine was non-tender. Claimant demonstrated some myofascial banding over the bilateral trapezius muscle but was significantly improved since his last visit. Claimant had tenderness of his lumbar spine, but, overall, was considered stable. His gait was within normal limits, his myofascial pain was greatly improved, and his back pain was being managed well with medications. Claimant complained of anxiety, reporting he had tried Cymbalta, which made him dizzy, and Celexa, which did not help. Claimant was advised to consult with his primary care physician. (Tr. at 362-66).

On November 20, Claimant reported increased panic attacks. (Tr. at 341). On examination, he walked with an antalgic gait employing the use of a cane. (Tr. at 342). He was assessed with myofascial pain, post laminectomy syndrome of the lumbar spine, left-sided radiculopathy, and cervical pain with radiculopathy. Claimant was advised to stop taking Robaxin and begin taking Zanaflex. When Claimant was informed that his drug screen result from September was positive for benzodiazepines, he admitted taking another person's medication. (Tr. at 344-45). Claimant was counseled to remain compliant with his medication regimen and was advised of the illegality of taking another person's prescription medication. On December 10, Claimant reported an increase in right-sided neck pain although Zanaflex offered some pain relief. (Tr. at 324). Claimant received trigger point injections in the right trapezius muscle. (Tr. at 326-27).

Claimant returned to St. Mary's Pain Relief Center on January 21, 2013. (Tr. at 314-

23). Claimant complained of left shoulder blade pain, with left arm numbness and itching of the left palm. Claimant reported that his medication regimen, which included Zanaflex, Lyrica and Percocet, provided great pain relief. Claimant also remarked that he received significant myofascial pain relief from the trigger point injections. On examination, Claimant had a decreased range of motion of the upper extremities. Claimant showed tenderness over the left acromial clavicular joint, as well as pain with abduction and adduction of the left upper extremity. There was also tenderness over the cervical spinous process, bilateral trapezius muscles, and lumbar spine. However, Claimant's gait was within normal limits. PA Clay assessed Claimant with cervical pain and associated radiculopathy, low back pain, left shoulder pain, and myofascial pain. Although Claimant denied chest pain, shortness of breath, blurred vision or headaches, a cardiac component to Claimant's complaint of left shoulder and arm pain could not be eliminated. Claimant was referred to Scott Orthopedics for consultation concerning the shoulder pain and advised to go the emergency room if he became short of breath, had vision changes, or severe headaches. Claimant received two cervical epidural steroid injections at C5-C6. (Tr. at 316-17).

Claimant presented to Dr. Marsteller on February 19, 2013 with complaints of back and shoulder pain and to follow up on his hypertension and COPD. (Tr. at 211). Claimant reported he continued to smoke cigarettes and drink alcoholic beverages, six to twelve drinks a week. Claimant was not examined at this visit but his blood pressure was recorded at 126/80.

Claimant returned to St. Mary's Pain Relief Center on April 24, 2013. (Tr. at 301-08). He complained of constant low back and left hip pain, as well as neck pain and numbness of the left arm. Claimant reported prior epidural injections offered a thirty

percent reduction in pain for two months and that pain medication did give him some relief. Claimant previously received an injection in his shoulder administered by Dr. Hegg at Scott Orthopedic that according to Claimant, "loosen[ed]" up his shoulder; however, according to Claimant, Dr. Hegg felt the shoulder pain stemmed from Claimant's neck. On examination, Claimant weighed one hundred sixty-nine pounds and had a blood pressure of 134/82. His physical examination was within normal limits, except that Claimant showed pain with range of motion of the cervical spine and had tenderness of the cervical spinous process. His straight leg raise test was negative, however, and Claimant walked with a normal gait. Claimant demonstrated strong and equal grip strength. As Lyrica was not covered under Claimant's health insurance, it was discontinued from the medication regimen and replaced with Neurontin. Cervical epidural steroid injections were scheduled and a request for insurance authorization for an MRI was submitted.

On June 14, 2013, Claimant underwent an MRI of the cervical spine at St. Mary's Medical Center. (Tr. at 209-10, 295-96). David Keadle, M.D., examined the films and determined that Claimant's vertebral bodies were normal in height, but there was diffuse disc space narrowing, osteophyte formation consistent with degenerative disc disease, and an area of soft tissue signal at the right posterior lateral aspect of the spinal canal at T2-T3. Posterior disc osteophyte complex, facet hypertrophy on the left, and moderate left-sided neural foraminal stenosis was found at C3-C4, but no significant canal stenosis. At C4-C5, there was posterior disc osteophyte complex, but no significant canal or neural foraminal stenosis. Facet hypertrophy on the left at C5-C6 was identified, without significant canal or neural foraminal stenosis. At C6-C7, there was broad posterior disc osteophyte complex and moderate bilateral neural foraminal stenosis, but no significant

18

canal stenosis.

Claimant returned to St. Mary's Pain Relief Center on June 21, 2013 with continued complaints of low back, neck, and left shoulder pain. (Tr. at 287-94). Claimant reported that he felt like "something [was] wrong in his neck." His physical examination was normal, except for pain on rotation of the cervical spine and tenderness over the cervical, lumbar and thoracic spinous process. (Tr. at 292-93). Claimant demonstrated equal grip strength and his gait was found to be within normal limits. PA Clay assessed Claimant with cervical pain with radiculopathy, thoracic pain, low back pain, left shoulder pain, and myofascial pain. PA Clay increased Claimant's Neurontin and requested an authorization for an MRI of the thoracic spine.

Claimant presented to St. Mary's Medical Center on July 30, 2013 for an MRI of the thoracic spine. (Tr. at 207-08). The MRI revealed facet hypertrophy/ligamentum flavum hypertrophy without enhancement at T2-3 as well as minor disc degenerative changes. Charles Siegler, M.D., reviewed the MRI results and opined that these findings indicated mild right-sided posterior canal narrowing.

On September 11, 2013, Claimant was examined by Amy Marsteller, M.D. (Tr. at 203-06). Claimant reported that Neurontin was not controlling his pain, and injections only offered temporary pain relief. However, Claimant's insomnia, anxiety, and hypertension were well controlled with medication. Claimant's medication regimen included Amitriptyline, Amlodipine Besylate, Citalopram, Dexilant, Percocet, Spiriva, Ventolin and Zanaflex. Claimant weighed one hundred eighty-three pounds and his blood pressure was 141/90. Claimant continued to smoke two packs of cigarettes per day and consumed six beers a day several times a week. Claimant's physical examination was unremarkable. Dr. Marsteller diagnosed Claimant with benign essential hypertension-

well controlled, ingrown toenail, and anxiety disorder, not otherwise specified.

Claimant returned to St. Mary's Pain Relief Center on October 7, 2013. (Tr. at 267-76). He reported constant moderate low back pain and constant mild to moderate neck pain. Claimant had resumed taking Lyrica for pain control, reporting that it worked better than Neurontin. A drug screen administered in September was again positive for benzodiazepines and this was discussed with Claimant. A review of systems was negative other than complaints regarding toenail removal. (Tr. at 271). Dr. Caraway noted that Claimant had no neurological deficits but did have pain when walking more than a few minutes. The conditions identified on the most recent thoracic MRI appeared to be stable with no significant nerve root impingement; however, Claimant did have multilevel degenerative changes. On examination, Claimant could stand unassisted and showed good range of motion in all extremities. Lumbar flexion was greater than thirty degrees and there appeared good range of motion of the cervical spine. Claimant was assessed with chronic low back pain. Dr. Caraway opined that while Claimant had very significant changes at L4-L5 and L5-S1, there was no plan for surgical intervention. Claimant had failed conservative treatment, and there was nothing else to offer Claimant as his medical card did not cover spinal cord stimulation. Dr. Caraway advised Claimant to continue taking Lyrica and oxycodone given that these medications enabled him to "perform most of his usual activities of daily living."

Claimant presented to St. Mary's Pain Relief Center on December 26, 2013. (Tr. at 237-62). He complained of depression and remarked that he was "fighting for his disability" and bothered by pain. Claimant also wished to learn about smoking cessation as he found it increasingly hard to breathe. On examination, Claimant weighed one hundred eighty-six pounds and had a blood pressure of 128/83. His physical examination

was unremarkable, except for pain on rotation of the cervical spine and tenderness over the cervical and lumbar spinous processes. Claimant showed good range of motion of his upper and lower extremities, and his grip strength was strong and equal. Claimant was given a prescription for Wellbutrin to promote weight loss, smoking cessation, and help with depression.

Claimant returned to St. Mary's Pain Relief Center on February 28, 2014 complaining of a slight increase in anxiety that he felt could have been caused by a death in the family. (Tr. at 587-89, 591-95). He also reported that he had not lost any weight or noticed a decrease in smoking despite taking Wellbutrin. Claimant did admit that he had engaged in heavy drinking over the holidays and did not take his medication. Claimant added that he had mild to moderate neck pain and constant low back pain, which he described as "achy" and "sharp," aggravated by sneezing, coughing, stooping, standing, walking, sitting and bending; however, taking pain medication, resting, and use of heat on the affected area provided some relief. Claimant stated that his neck pain was aggravated by turning his head to the right or left, looking up or down, and coughing or sneezing. (Tr. at 591-92). On examination, Claimant appeared alert and oriented, had a blood pressure of 123/86, and weighed one hundred eighty-nine pounds. Claimant demonstrated decreased range of motion of the lumbar spine with tenderness over the thoracic and lumbar spine and a slight decrease in the strength of his lower extremities. However, Claimant's grip strength was strong and equal and his gait was normal. Claimant was assessed with chronic low back pain, cervical pain, myofascial pain, and depression. Claimant was advised to continue taking Wellbutrin and to focus on weight loss and smoking cessation.

On April 29, 2014, Claimant presented to St. Mary's Pain Relief Center reporting

that Wellbutrin increased his anxiety and decreased his appetite. (Tr. at 578-86). Claimant reported no change in his chronic pain and complained of sleep disturbance and dry eyes and mouth. Upon examination, Claimant walked with a normal gait, weighed one hundred eighty-six pounds, and had a blood pressure of 138/84. A physical examination revealed regular heart rate and rhythm and clear lungs; however, Claimant did have tenderness over the cervical and lumbar spine. Claimant demonstrated good range of motion of the upper extremities, showing strong and equal grip strength. Strength in the lower extremities was slightly diminished. Claimant was advised to continue taking Wellbutrin and was given a pamphlet on smoking cessation.

Claimant returned to St. Mary's Pain Relief Center on June 30, 2014 with complaints of radicular pain in the right hip and leg. (Tr. at 574-77). Claimant weighed one hundred seventy-nine pounds with a blood pressure of 136/80. Claimant walked with a normal gait and appeared alert and oriented. On examination, Claimant reported tenderness over the lumbar spine and the right greater trochanteric bursa. Claimant exhibited minor diminished lower extremity strength, measuring 4/5. Neurologically, no focal gross abnormalities were found. Because Wellbutrin did not aid in Claimant's attempt to quit smoking and appeared to cause him increased anxiety, PA Clay desisted Wellbutrin. She suggested that Claimant discuss with his primary care physician whether an increase in the dosage of Lyrica might help to reduce Claimant's radicular pain.

On September 3, 2014, Claimant presented to Dr. Marsteller in regular follow up of his alcohol dependence, anxiety, benign hypertension, COPD, insomnia and lumbar radiculopathy. (Tr. at 400-02). Claimant's current medication regimen included Amitriptyline (depression), Amlodipine Besylate (hypertension), Dexilant (GERD), Lyrica (nerve pain, fibromyalgia), Percocet (pain relief), Spiriva (COPD), Ventolin

22

(COPD), Norvasc (hypertension), and Zanaflex (muscle relaxant). Claimant told Dr. Marsteller he had an upcoming appointment at Prestera Centers for Mental Health ("Prestera") for treatment of anxiety. Claimant reported that he did obtain some pain relief from taking Percocet, Zanaflex, and Lyrica, but the morning doses of the medications typically wore off by the afternoon. On examination, Claimant weighed one hundred eighty-two pounds and his blood pressure was 136/72. He was in no acute distress, demonstrating normal breath and voice sounds, with no wheezing, rhonchi, rales or crackles detected. Claimant's heart rate and rhythm were normal without bradycardia, tachycardia, or murmurs observed. Claimant had no edema of his feet and posterior tibial pulses were present in both feet. Dr. Marsteller diagnosed Claimant with benign essential hypertension-well controlled; COPD; lumbar radiculopathy; and anxiety disorder, not otherwise specified. Claimant was counseled to stop smoking, adhere to a healthy diet, exercise, and keep his appointment with Prestera. Dr. Marsteller increased Claimant's dosage of Lyrica and advised him to continue his treatment with St. Mary's Pain Relief Center.

Claimant returned to St. Mary's Pain Relief Center on September 4, 2014. (Tr. at 565-73). Claimant reported increased pain in his neck, low back, and left hip, rating the severity as seven out of ten, and describing the pain as constant, sharp, shooting and radiating. (Tr. at 570). A review of systems was positive for trouble urinating, numbness and tingling in extremities, anxiety, and muscle cramps. (Tr. at 571). PA Clay noted that Claimant emitted the odor of alcohol. On examination, his lungs were clear, but he had tachycardia. However, when asked, Claimant denied symptoms of heart palpitations, dizziness, or fatigue; instead, Claimant attributed the finding to anxiety and the hot weather. When examining Claimant's musculoskeletal system, PA Clay documented pain

with flexion and extension, as well as generalized tenderness, of the lumbar spine. Claimant's lower extremity strength was minimally diminished at 4/5. He had no focal gross neurological abnormalities and walked with a normal gait. A few days later, on September 9, Claimant underwent a chest x-ray at St. Mary's Medical Center. (Tr. at 398). Claimant's lungs were clear, his heart size was normal, and there were no acute findings, but there was evidence of old left rib fractures.

Claimant returned to St. Mary's Pain Relief Center two months later on November 4, 2014. (Tr. at 556-564). Claimant described his pain, which had "flared up," as chronic, sharp, throbbing and shooting, radiating down his left leg. Claimant also reported he had problems sleeping at night due to breathing issues, although he admitted that he still smoked cigarettes daily. On examination, Claimant had inspiratory wheezing in the upper and lower lobes, but his heart rate and rhythm were regular. A straight leg raise test was positive bilaterally at twenty degrees. He had tenderness over the lumbar spine and demonstrated pain mannerisms whenever he moved his lower extremities. In addition, Claimant had decreased flexion and extension; however, his gait was within normal limits. PA Clay assessed Claimant with acute or chronic low back pain, cervical pain, myofascial pain, and depression. Claimant was advised to discuss the possibility of a sleep study with his primary care physician and was counseled once again to stop smoking. For pain relief, Claimant was provided a Medrol Dose Pak.

Claimant returned to St. Mary's Pain Relief Center on December 18, 2014 and advised that the Medrol Dose Pak was only mildly effective in pain reduction; however, his medication regimen did help. (Tr. at 545-55). Claimant completed a systems review form noting no problems, except for neck, left leg, left hip, and low back pain. The pain was constant, but was controlled with medication. Claimant exhibited myofascial

tenderness over the bilateral trapezius and supraspinatus muscles as well as the lumbar paraspinal muscles. Claimant had pain with extension, lateral loading, flexion and extension. His gait was normal. PA Clay prescribed Mobic, oxycodone, and Zanaflex.

On March 20, 2015, Claimant presented to Rudy Malayil, M.D., at the St. Mary's Pain Relief Center with continuing low back and left hip pain, which Claimant rated five out of ten on the pain scale, but was somewhat relieved with medication and rest. (Tr. at 535-44). A review of systems was otherwise negative. On examination, Claimant weighed one hundred ninety-two pounds and had a blood pressure of 145/90. Claimant could walk normally with a non-antalgic gait. He presented with a normal mood and spoke with fluent speech. Claimant's lungs were clear; his heart demonstrated regular rhythm and rate, and neurologically, his cranial nerves II through XII were intact. Claimant reported that chronic pain had an adverse effect on his physical functioning, familial and social relationships, mood, sleep, and quality of life. Although his current pain medications helped him maintain his activities of daily living, he felt his chronic pain significantly interfered with his ability to perform activities of daily living, occupational and leisure activities. Dr. Malayil diagnosed Claimant with chronic pain syndrome, surgical back syndrome, radiculopathy, spondylosis, and degenerative disc disease. Claimant was advised to continue his medication regimen and follow up in three months.

Claimant returned to Dr. Marsteller on May 19, 2015 for follow up of his alcohol dependence, anxiety, benign hypertension, COPD, insomnia, and lumbar radiculopathy. (Tr. at 403-06). Claimant had stopped taking Elavil for insomnia as it caused dry mouth and grogginess, but he was now having issues falling and staying asleep. Claimant also complained that he did not feel like his bladder completely emptied when urinating; however, he had stopped taking Flomax because he felt it exacerbated his anxiety.

Claimant continued to drink alcohol, consuming three to four twelve ounce cans of beer per day and remarking that he had "cut down a lot." His physical examination was unremarkable. Dr. Marsteller noted that Claimant had a normal gait and stance. He did not show any decrease in the ability to concentrate; his affect was normal; his thought process and content were not impaired. Claimant was advised to lose weight, follow a healthy diet, increase his physical activity, and exercise. Dr. Marsteller diagnosed Claimant with benign essential hypertension that was well-controlled; benign prostatic hypertrophy; eczema triamcinolone; and primary insomnia for which Elavil was discontinued and replaced with a trial of Trazodone.

On June 7, 2015, Claimant underwent a CT scan of the abdomen and pelvis at St. Mary's Medical Center due to complaints of pain and diarrhea. (Tr. at 399). Hans Dransfeld, M.D., reviewed the results, finding that the CT scan revealed some evidence of fatty infiltration of the liver; however, there were no abnormalities noted of the lungs, spleen, pancreas, or kidneys. Claimant had no evidence of ascites or pelvic masses and his abdominal aorta was of normal caliber. Dr. Dransfeld observed evidence of mucosal thickening involving the ascending colon that was consistent with colitis. Based upon the CT scan results, Dr. Dransfeld assessed right-sided colitis.

Claimant returned to Dr. Malayil on June 23, 2015 with continued complaints of chronic low back and neck pain described as sharp, throbbing, shooting, and radiating; although, his prescribed medications did offer some pain relief. (Tr. at 530-34). On examination, Claimant walked with a non-antalgic gait. He appeared alert and oriented, comfortable, and in no acute distress, demonstrating a normal mood and fluent speech. Dr. Malayil spent significant time with Claimant counseling him on medications, side effects, pain symptoms, prognosis, proposed therapies, and treatment options. Dr.

Malayil documented that Claimant's condition was stable with the prescribed opioid therapy, which gave Claimant a modicum of assistance in maintaining his activities of daily living.

Claimant returned to Dr. Malayil on September 23, 2015. (Tr. at 395). On examination, Claimant weighed one hundred seventy-one pounds and had a blood pressure of 132/81. Based on Claimant's reports, Dr. Malayil documented that Claimant's activities of daily living and ambulation were limited due to pain. Claimant's medication regimen included Vistaril, Advair, Amlodipine Besylate, Dexilant, Finasteride, Lyrica, Percocet, Spiriva, Trazodone, Ventolin and Zanaflex.

### C. Disability Evaluations

On September 30, 2010, Emily E. Wilson, M.A., completed a mental status examination at the request of the West Virginia Disability Determination Service. (Tr. at 419-22). Claimant told Ms. Wilson that he began having anxiety and depression in 1985 with accompanying symptoms of excessive worry, fatigue, nightmares, sleep issues, difficulty breathing, excessive sweating, and restlessness. Claimant also had a history of herniated discs in the low back, sciatic nerve problems, and epilepsy. Claimant admitted that he suffered from alcohol abuse, beginning at age thirteen. According to Claimant, he started drinking in the morning, totaling "about 30 beers daily." Because of this issue, Claimant missed work occasionally and ultimately lost his driver's license after an arrest for driving under the influence. Claimant additionally smoked marijuana to reduce symptoms of pain and anxiety and, from time to time, he took prescription medication that was not prescribed for him. Claimant performed most of his activities of daily living independently including personal care, housework, cooking, listening to music, playing guitar, and working puzzles; however, he did not drive, shop, or handle family finances.

With respect to his educational history, Claimant completed the ninth grade. He received average grades, had no discipline problems, and participated in sports. Claimant began working at age 15. He mowed grass, worked as a gardener, did carpentry work, painted, hung dry wall, pulled parts from mining equipment, and worked as a furniture mover. Claimant reported that he was married and had two grown daughters. He enjoyed a good relationship with his family. As for mental health treatment, Claimant reported he attended counseling one time but with no result.

On mental status examination, Claimant was described as having a normal gait. He was dressed casually, with adequate hygiene, and was cooperative. Claimant was oriented in all four spheres; had good eye contact; and while his mood was appropriate to the situation, his affect was slightly nervous. Claimant demonstrated relevant, coherent speech and both thought process and content were within normal limits. Claimant's judgment and perception were within normal limits, and his insight was fair. Claimant's recent, remote, and immediate memory were within normal limits. When compared with the average individual, Claimant's concentration was found to be mildly deficient based upon the scaled score of seven on the digit span subtest of the WAIS-III. However, Claimant's persistence and pace were found to be within normal limits. Ms. Wilson diagnosed Claimant with alcohol dependence and anxiety disorder, not otherwise specified, with features of panic. She believed Claimant had a good prognosis if he received consistent and appropriate psychotropic and psychological interventions. She did not feel that Claimant was capable of managing benefits, however.

Kip Beard, M.D., completed an internal medicine examination on October 26, 2010 at the request of the West Virginia Disability Determination Service. (Tr. at 423-27). Claimant reported having a back surgery in 1987. Thereafter, he participated in therapy

and took medications, but beginning in 2008, the pain in his low back, mid back, and neck had increased. Claimant described the back and neck pain as constant, but not radiating, causing issues with completing chores such as washing dishes, using the vacuum, or sweeping. Coughing or sneezing increased lower left-sided back pain; however, taking hot baths and Advil offered some pain relief. Claimant also had a history of seizures, beginning at age 18, the last seizure having occurred in the early 1990's. Claimant no longer took medication for seizures and had not had one in many years. Claimant admitted to smoking two packs of cigarettes a day and to drinking "a lot" of alcohol. Dr. Beard documented that Claimant smelled of alcohol; however, he did not appear intoxicated and was cooperative. A review of systems was negative for shortness of breath, chest pain or palpations, abdominal pain, urinary issues or seizures, fainting or dizziness.

On examination, Claimant presented a mildly stiff posture when ambulating but otherwise had a normal gait and did not use assistive devices. Claimant could stand unassisted, rise from a seat, and step up and down from the examination table without difficulty. He was comfortable in the seated position, but had back pain when supine. Claimant's neck, chest, cardiovascular system, and abdomen were normal. Examination of the extremities revealed the dorsalis pedis and posterior tibial pulses were palpable. There was no evidence of peripheral vascular insufficiency or chronic venous stasis and no clubbing, cyanosis, or edema was present. Claimant had mild pain with tenderness and stiffness, without spasm, of the cervical spine. Extension measured to forty-five degrees, flexion measured to fifty degrees, with rotation to seventy degrees bilaterally. Testing the motion of Claimant's shoulders elicited pain in his back and neck. Tenderness was noted over the lumbar spine with some palpable rigidity; however, no spasm was appreciated.

Flexion was to seventy degrees with otherwise normal range of motion. The straight leg raise test measured ninety degrees in the seated position with back pain and seventy-five degrees with back pain while supine. Claimant had no radicular complaints, hip pain or tenderness. Claimant was able to stand on one leg, heel walk, toe walk, tandem walk and squat three quarters of the way with back pain. Manuel muscle testing revealed intact sensation. Deep tendon reflexes measured 2+ of the biceps, 1+ triceps, 2+ patellae, and 1+ right Achilles, but was absent in the left Achilles. Dr. Beard diagnosed Claimant with history of left lumbar radiculopathy status post lumbar surgery; chronic cervical, thoracic and lumbosacral strain with probable spondylosis and degenerative disk disease; and remote history of seizures, currently in remission. Claimant had a residual loss of his left Achilles tendon, most likely due to remote radiculopathy; however, he had no obvious clinical acute radiculopathy or sciatica, as the straight leg raise test was negative and there was no sensory loss, motor weakness, or atrophy. An x-ray of Claimant's lumbar spine taken the same day showed a slight narrowing of L5-S1 as well as moderate narrowing of L4-L5. The remainder of the interspaces were normal and no compression fracture or scoliosis was seen. (Tr. at 428).

On November 10, 2010, Rachel Arthur, M.A., completed a psychological evaluation. (Tr. at 429-33). Claimant presented with a slow, slightly limping gait though his posture was unremarkable. Claimant told Ms. Arthur he had back trouble and when he coughed or sneezed, he had to "hold on to something cause it'll throw [him] to the floor." Claimant also reported that he had arthritis for which he took Advil. As for his mental health, Claimant reported a history of recurrent depression that began as a teenager but worsened in 2003 with the death of his mother. Claimant explained that when he felt significantly depressed, his symptoms included a lack of interest, excessive

appetite, loss of energy, feelings of worthlessness, suicidal ideations and irritability. In between episodes, Claimant had full remission of the outlined symptoms. He rated his current state of depression as the "worst ever." Claimant also experienced anxiety, beginning in childhood and currently experienced constant worry, restlessness, lack of concentration, and muscle tension. Claimant said that he was normally very energetic and outgoing, but now felt very nervous when in crowds or with strangers. Claimant told Ms. Arthur that he began drinking alcohol at an early age, but denied being dependent on it. Nonetheless, Claimant admitted that the longest period he went without drinking alcohol was four to five days. He also admitted to a prior arrest for DUI and to having blackouts. Ms. Arthur documented that Claimant smelled of alcohol during the evaluation and, when questioned, he conceded that he "drank a couple of beers" before arriving. Claimant's activities of daily living included watching television, listening to music, and using the internet to play games and interact with others. Claimant did not engage in hobbies, attend social gatherings, shop, or handle the family finances.

On mental status examination, Claimant was cooperative and oriented in all four spheres. He demonstrated an appropriate mood and broad affect. His thought process, thought content, and judgment were all within normal limits. Claimant showed fair insight. Both immediate and remote memory were within normal limits; however, Claimant's recent memory appeared moderately impaired based upon his ability to recall only one of four words after a period of fifteen minutes. Claimant exhibited normal psychomotor activity; however, his concentration was found mildly deficient based upon his scaled score of seven on the Digit Span task. On the Pain Disability Index, Claimant was placed in the fifty-seventh percentile as he reported high levels of disability for occupational and recreational activities, and moderate levels of disability for activities of

daily living and social activities. Ms. Arthur administered the Beck Depression Inventory-Second Edition (BDI-II) test. Claimant scored twenty-four, suggesting a moderate range of depressive symptoms. Ms. Arthur assessed Claimant with major depressive disorder, single episode, mild; anxiety disorder, not otherwise specified; and alcohol dependence. He received a Global Assessment of Functioning ("GAF") score of 53.[2] Ms. Arthur felt Claimant's prognosis was fair to poor, though likely to improve if he received appropriate psychological and psychotropic interventions. She did not believe that Claimant possessed insight into his emotional problems and thought psychotherapy, either in a group setting or individually, would assist in his overall functioning.

On December 3, 2013, Jeff Boggess, Ph.D., completed a Psychiatric Review Technique form based upon his analysis of Claimant's records. (Tr. at 212-25). Dr. Boggess diagnosed Claimant with non-severe anxiety-related and substance addiction disorders. He opined that Claimant had mild limitations in activities of daily living, maintaining social function, and concentration, persistence, or pace. Claimant had no episodes of decompensation, nor did the evidence establish the paragraph "C" criteria. Dr. Boggess found that since 2012, the date of the prior ALJ's decision, Claimant had received treatment from his primary care physician with the most recent evidence demonstrating that Claimant's mental health symptoms were well controlled. Dr. Boggess

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score indicates a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

did not find any records to suggest a deterioration in function since 2012. Dr. Boggess provided Claimant with a seizure questionnaire; however, Claimant called Dr. Boggess and advised he did not take medication for seizures and had not experienced a seizure for many years. On April 17, 2014, Rosemary L. Smith, Psy.D. completed a case analysis affirming the findings of Dr. Boggess as written. (Tr. at 386).

On December 10, 2013, A. Rafael Gomez, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 226-33). Dr. Gomez determined that Claimant could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand, walk or sit about six hours each in an eight-hour workday; and had unlimited ability to push and/or pull. As for postural limitations, Claimant could frequently climb ramps or stairs, balance, stoop, kneel or crouch, but could only occasionally crawl and could never climb ladders, ropes, or scaffolds. Dr. Gomez based these restrictions on Claimant's history of seizure disorder and his substance abuse. Claimant had no manipulative, visual, or communicative limitations. Dr. Gomez found that Claimant could tolerate unlimited exposure to wetness, humidity and noise, but needed to avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights. Under the additional comments section of the form, Dr. Gomez opined that Claimant maintained the functional capacity for light work, noting that this finding remained unchanged from the prior ALJ's decision rendered in March 2012.

On April 21, 2014, Rabah Boukhemis, M.D., reviewed the record and completed a Physical Residual Functional Capacity Assessment. (Tr. at 387-94). Dr. Boukhemis documented that on December 26, 2013, Claimant was assessed at the St. Mary's Center for Pain Relief. At that time, Claimant demonstrated good range of motion, a normal gait

33

and strong grip. (Tr. at 394). Claimant's medical issues included chronic low back, cervical, and myofascial pain. Based upon his review of the record, Dr. Boukhemis opined that Claimant still retained the functional capacity for light work. Dr. Boukhemis explained that there was no new and significant evidence supporting a need to change that opinion.

On January 12, 2016, Richard Reeser, M.A., completed a psychological evaluation at the request of Claimant's counsel. (Tr. at 596-601). Claimant reported feeling like he was "going crazy." He worried constantly, cried for no reason twice a day, had sleep issues, prior thoughts of suicide, and a loss of interest. In addition, Claimant stated that he drank a six-pack of beer per day when he could afford it, and in the past, drank thirty beers a day. Claimant denied using "street" drugs, but did smoke marijuana occasionally. Mr. Reeser documented that Claimant was friendly and cooperative; however, his conversation contained themes of sadness and fear. Claimant demonstrated a depressed and anxious mood, but presented a bright affect. His thought process and content were normal. Although he was oriented to person and place, Claimant was incorrect about the current date by six days. Nevertheless, his remote and recent memory were fair. Claimant took the Millon Clinical Multiaxial Inventory III ("MCMI-III") test, which Mr. Reeser interpreted despite having concerns as to the validity of the test results. Mr. Reeser felt Claimant's results showed a broad tendency to magnify his illness and a characterological inclination for self-pity or to complain. Conversely, the results could also convey feelings of extreme vulnerability associated with acute turmoil. As far as clinical syndromes, Mr. Reeser found Claimant to be predominately preoccupied with personal adequacy, chronic feelings of worthlessness and guilt, revealing a socially awkward and introverted person. Mr. Reeser also indicated Claimant had recurrent episodes of alcoholism, creating a major

obstacle to Claimant's well-being. He described being anxious, moody and aggrieved; all of which corroborated Claimant's preoccupation with physical fears and complaints to the extent of constituting a somatoform disorder. Mr. Reeser believed that Claimant was in a moderately intense hypomanic period, and his responses suggested that he had either abused or was currently abusing drugs. Based upon test results, when in withdrawal or in self-deprecation, Claimant appeared to be unable to cope and, instead, complained of physical weakness and fatigue. Mr. Reeser assessed Claimant with major depressive disorder, recurrent episode-mild; alcohol use disorder-mild; unspecified anxiety disorder; and by history, spinal problems and high blood pressure. Mr. Reeser opined that Claimant would have difficulty finding and sustaining employment. Based on his long-standing alcohol abuse, Claimant might not be able to manage benefits on his own.

Mr. Reeser also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 599-601). Mr. Reeser found that Claimant had no limitations in carrying out simple instructions or making judgments on simple work-related decisions; however, Claimant had mild restrictions in understanding and remembering simple instructions; marked restrictions in understanding, remembering and carrying out complex instructions; and extreme restrictions in making judgments on complex work-related decisions. Mr. Reeser based these findings on the results of the MCMI-III test, which showed the presence of significant depression and anxiety. Mr. Reeser also concluded that Claimant was moderately limited in his ability to interact appropriately with supervisors or co-workers, or respond appropriately to changes in the routine work setting; and markedly limited in his ability to interact appropriately with the public. His basis for this determination was also derived from MCMI-III test results.

On January 30, 2016, at the request of Claimant's counsel, Paul W. Craig, II, M.D.,

completed a Physical Residual Functional Capacity Assessment. (Tr. at 602-05). Dr. Craig reviewed the MRI of Claimant's lumbar spine taken in February 2011, which showed multilevel degenerative changes, severe spinal stenosis, epidural scarring from a prior surgery, extruded disk fragments, and left lateral recess stenosis. Dr. Craig also noted Claimant's 2013 cervical and thoracic MRI results, which revealed less severe degenerative spondylosis. Dr. Craig concluded that these conditions resulted in intractable chronic pain that waxed and waned in intensity, causing Claimant to require regular opiate medication under supervision of a pain clinic. Dr. Craig also reviewed Claimant's other health issues; including, COPD, aggravated by cigarette smoking, and alcoholism. In his Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Craig opined that Claimant could lift and/or carry up to ten pounds, but was unable to do so occasionally (defined as from very little up to 1/3 in an eight-hour workday) or frequently (defined as from 1/3 to 2/3 of an eight-hour workday). Claimant could stand and/or walk for one to two hours in an eight-hour workday, but only less than one-half hour without interruption. Claimant could sit for two to four hours in an eight-hour workday, but only one to two hours without interruption. As for postural limitations, Claimant could occasionally, but rarely, partially stoop. He could never climb, balance, crouch, kneel, or crawl. Dr. Craig also felt that Claimant had physical functional impairment in reaching, pushing, and pulling, but had no impairment in handling or feeling. He likewise had no visual or communicative limitations. Dr. Craig explained that Claimant could not reach due to neck, upper back, and lumbar problems. He found that for Claimant, reaching was limited to objects that were in close proximity, because reaching far and stretching would aggravate Claimant's conditions. Claimant could not push or pull more than ten to forty-five pounds, and only on rare occasions. Dr. Craig

determined that Claimant had environmental restrictions regarding heights, moving machinery, temperature changes, dust, noise, fumes, humidity, and vibration. These limitations were based upon Claimant's inability to work in an industrial environment due to safety concerns and physical limitations. In addition, Dr. Craig believed Claimant might have an issue with endurance in view of his COPD. Dr. Craig also indicated that Claimant's depression, anxiety, and alcohol and tobacco abuse needed to be addressed. Based upon the evaluation, Dr. Craig assessed Claimant with physical limitations limiting him to "sedentary to very light levels of activity that can be expected to wax and wane in severity"...Claimant is "for all practical purposes 100% occupational disabled"... with "no possibility he will ever again be able to work an 8 hour day, 5 days a week"... "even more likely given his educational limitations and vocational job history which involved heavy manual labor."

### D.  Claimant's Statements

In an Adult Function Report, Claimant stated that he reclined, sat, and stood "a lot" due to his chronic back pain, but could not do any of these for an extended period of time. (Tr. at 149). As far as his personal care, he occasionally needed help getting out of the bathtub. Claimant stated that he could not stand long enough to prepare meals, needed help with all outside chores, did no inside chores, and could not walk very much. (Tr. at 150-51). Claimant stated that he could ride in a car, but could not drive because his license was suspended. He described his hobbies as watching television and music. (Tr. at 152). Claimant alleged that he could not lift anything and used a cane to walk, although it was not prescribed by a physician. (Tr. at 153-54). In addition, Claimant experienced panic attacks and depression.

In a second Adult Function Report, Claimant indicated that he could not sleep well

due to pain  and suffered when he stood too long. (Tr. at 168-69). He reiterated that he did not perform any chores around the house, could not walk very far, and did no shopping. (Tr. at 169-70). His hobbies included watching television and playing cards, although he could not play long because he could not sit very long. (Tr. at 171). Claimant stated that he spent time with others, talking and playing cards, but generally stayed home. Claimant indicated that his ability to lift was greatly reduced, and he could not walk any further than 100 feet before needing to rest. He had problems concentrating and continued to walk with a cane. (Tr. at 172-73).

At the administrative hearing, Claimant testified that he could "do little things," but needed to take many breaks. (Tr. at 616). He was unable to lie down, sit, or stand for long periods of time, uninterrupted, and could not lift heavy objects. Claimant stated that he had back surgery when he was eighteen years old and currently treated his back pain with medications. (Tr. at 619-20). Claimant testified that he had also received injections to reduce the pain, but they were not effective. He estimated that he could lift five to ten pounds; could stand 30-35 minutes at one time; could walk less than a block if he used his cane; and could sit for about an hour before needing to get up. (Tr. at 620-21). He indicated that he had a problem with alcohol abuse, and had panic attacks and anxiety. (Tr. at 621-22). Claimant described having numbness in his legs, especially on the left, which caused him to limp. He had severe breathing problems for which he took Spiriva and Advair and used a rescue inhaler. (Tr. at 623). Claimant denied being able to sleep any more than three to four hours per night, stating that he never had a pain-free day. His pain averaged about an eight or nine on a ten-point scale, requiring him to use opioids for pain relief. His pain fluctuated some, but on bad days, he was "completely miserable." (Tr. at 626). In the prior thirty days, Claimant testified that at least twenty-eights days were

bad. (Tr. at 627). Claimant strenuously denied being able to do any job, because of his back and hip pain and his need to frequently change position. (Tr. at 627-28). He did admit, however, that he could ride in a car for a couple of hours before having to stop. He stated that Percocet was very helpful in reducing his pain, but some time he took more than prescribed and would not have enough for the following day. As for hobbies, Claimant testified that he played the guitar every couple of days, watched television, and occasionally played computer games or cards. (Tr. at 629).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether sufficient evidence exists to sustain the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). In other words, the issue for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

As previously stated, Claimant asserts two challenges to the Commissioner's decision. First, Claimant argues that the ALJ's RFC finding is erroneous in that the ALJ found Claimant capable of light level exertional work when the evidence clearly supports a conclusion that Claimant can do no more than sedentary level work. Second, Claimant alleges that the Appeals Council failed to adequately consider new and material evidence submitted after the ALJ's decision. Each challenge will be addressed in turn.

### A. RFC Finding

After "careful consideration of the entire record," the ALJ found that Claimant had the RFC to perform less than a full range of light exertional work. The ALJ determined that Claimant's neck and back pain, and its associated symptoms, prevented Claimant from ever climbing ladders, ropes, and scaffolds and limited his ability to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl to no more than two hours and forty minutes out of an eight-hour workday (i.e., occasionally). (Tr. at 20). The ALJ also considered how Claimant's impairments affected his ability to tolerate environmental factors and concluded that Claimant should avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants, and hazards. Finally, the ALJ assessed the impact of Claimant's depression, anxiety, alcohol consumption, and decreased concentration on his ability to perform sustained work-related activities and found that Claimant retained the RFC to understand, remember, and carry out simple instructions and occasionally interact with others. (Tr. at 20-25).

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A

'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. Jul. 2, 1996). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments. The RFC finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 416.945(b-d). Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Nonetheless, the scope of "judicial review in social security cases is quite limited." *Smith v. Colvin*, No. 1:14-29870, 2016 WL 1249270, at *1 (S.D.W. Va. Mar. 29, 2016). "When reviewing a Social Security disability determination, a reviewing court must uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Cuffee v. Berryhill*, No. 15-2530, 2017 WL 715070, at *2 (4th Cir. Feb. 23, 2017) (internal citations and markings omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion" and it "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (citation omitted). Significantly, in reviewing for substantial evidence, courts must not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* Furthermore, the ALJ is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c).

In this case, the undersigned **FINDS** that the ALJ applied correct legal standards in conducting the RFC assessment. She reviewed the clinical evidence, Claimant's statements, and the medical source opinions, explaining how she resolved conflicts in the record and describing the evidence that informed her credibility evaluation. By considering the longitudinal record, the ALJ was able to follow the progression, if any, of Claimant's symptoms. She also performed the required function-by-function analysis, taking into consideration Claimant's statements regarding his functional abilities, records containing evidence of his actions and activities, and the medical source evaluations. She then explained which of Claimant's impairments resulted in the limitations in his RFC finding. Clearly, the ALJ followed the governing rules and regulations in conducting the analysis. Indeed, even Claimant does not dispute that the ALJ's process conformed with applicable regulations and ruling. Instead, Claimant quarrels with the ALJ's RFC determination.

Claimant points to various pieces of evidence that he believes are corroborative of his inability to perform a reduced range of light level exertional work. All of the evidence mentioned by Claimant was considered by the ALJ. To the extent Claimant asks the Court to re-weigh this evidence, the Court will decline, as such a task is not within the limited scope of the Court's review. However, considering the record as a whole, the undersigned **FINDS** that the ALJ's RFC determination is supported by substantial evidence.

The ALJ noted that Claimant had previously filed an application for disability benefits that resulted in a denial of his claim in March 2012. (Tr. at 25). In accordance with circuit precedent, the ALJ took the prior administrative findings into account, including the prior ALJ's determination that Claimant could do light level exertional work. Nevertheless, instead of simply starting with the prior administrative finding, the

ALJ considered the history of Claimant's back, neck, and hip pain to form a complete picture of his current functional abilities. The ALJ acknowledged that Claimant suffered a back injury at age 18, which resulted in surgery. At first, Claimant did well, but began to develop pain and numbness as he aged. (Tr. at 21). The ALJ also discussed Claimant's 2011 lumbar spine MRI, which revealed advanced degenerative changes with severe acquired spinal stenosis at L5. Claimant was evaluated at the St. Mary's Pain Center and diagnosed with post laminectomy syndrome of the lumbar spine with left-sided radiculopathy. Claimant received treatment for his condition, which included injections and medications. Some of the injections helped to reduce his pain, and he felt that some of the medications were likewise useful. Thoracic and cervical MRIs were taken in 2013, which showed disc and facet degeneration, osteophyte formation, mild narrowing of the thoracic canal, and moderate bilateral neural foraminal stenosis of the cervical spine. Having established the objective findings and the history of Claimant's pain, the ALJ reviewed discrete findings in the treatment records. She indicated that in December 2013, Claimant was evaluated at the Pain Center and had good range of motion of his upper and lower extremities, normal gait, and an absence of focal or gross abnormalities. (Tr. at 23). He advised the health care provider that he was receiving pain relief from his medications. In February 2014, Claimant's symptoms were worse, but he admitted that he had not been taking his medication as prescribed, because he was drinking excessively and did not want to mix substances. In November 2014, Claimant again had an exacerbation of symptoms, but once more, conceded that he was not taking his medication as prescribed.

The ALJ observed that during this period between 2013 and 2015, Claimant complained consistently of debilitating pain; however, the records contained few of the findings typically seen with severe, unrelenting pain and physical inactivity. For example,

Claimant did not demonstrate strength deficits, circulatory compromise, neurological deficits, muscle spasms, fasciculation, fibrillations, muscle atrophy or muscle dystrophy. (Tr. at 24). By most accounts, Claimant responded well to treatment without adverse side effects or complications, and no provider had prescribed assistive devices or surgical intervention for him. His treatment was relatively conservative and had not changed much over time. Claimant's most recent neurological examination was normal and his musculoskeletal examination showed no swelling, effusion, or abnormality. (*Id.*).

In addition to the lack of signs associated with long-standing severe pain, the ALJ found Claimant's activities to be inconsistent with his descriptions of disabling symptoms. The ALJ pointed out that Claimant was able to keep his numerous physician appointments, take care of his personal needs, and visit with family members. Contrary to his statements regarding the need to change positions frequently, Claimant reported to a provider in February 2014 that he had just returned from a trip to Florida. He also was able to watch television, play cards and video games, and play his guitar.

The ALJ noted that no treating medical source had provided a recent RFC assessment, so she considered the assessments provided by agency consultants. The consultants found Claimant capable of light level exertional work with minimal postural limitations; no communicative or visual limitations; and a number of environmental limitations. (Tr. at 226-33, 394). Both agency medical sources were aware of Claimant's advanced degenerative changes of the spine and acquired spinal stenosis, but did not believe that these impairments reduced Claimant's level of exertional work from light to sedentary. Regardless, the ALJ emphasized that since the agency consultants performed their assessments, Claimant had produced evidence supporting additional postural restrictions. In reaching this conclusion, the ALJ considered the examinations performed

by Emily Watson, Rachel Arthur, and Dr. Beard and the more recent treatment records. (Tr. at 25). In accordance with the evidence, the ALJ reduced the light level occupational base, concluding that the jobs available to Claimant were more restricted than previously determined in March 2012.

Therefore, the ALJ fulfilled her mandate to review the evidence as a whole when determining Claimant's RFC and to provide a reasonable explanation for her ultimate finding. Claimant's disagreement with the outcome of the analysis or the weight given to various pieces of evidence by the ALJ is not a reason to reverse and remand the decision, when the ALJ's assessment was properly performed, supported by substantial evidence, and explained in a manner that created a logical bridge between the record and the finding. Here, there is significant evidence to support the ALJ's decision that Claimant was capable of performing less than a full range of light level work.

### B.  Appeals Council's Treatment of New and Material Evidence

Claimant next argues that the Appeals Council erred by not giving sufficient weight to new and material evidence submitted after the ALJ's decision. In particular, Claimant's attorney sent him to two consulting medical sources, Mr. Richard Reeser and Dr. Paul Craig, who examined Claimant once and prepared reports and RFC assessments, which were submitted to the Appeals Council. The Appeals Council incorporated the consultants' findings and opinions into the record, but found that the ALJ's decision was not contrary to the weight of all of the evidence, including the new and material evidence.

When new and material evidence is submitted to the Appeals Council after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and

material evidence submitted if it relates to the period on or before the date
of the administrative law judge hearing decision. It will then review the case
if it finds that the administrative law judge's action, findings, or conclusion
is contrary to the weight of the evidence currently of record.

20 C.F.R § 416.1470(b).[3] Evidence is new when it is not "duplicative or cumulative," and

is material "if there is a reasonable possibility that the new evidence would have changed

the outcome." *Wilkins v. Secretary, Dep't of Health and Human Servs.,* 953 F.2d 93, 96

(4th Cir. 1991). When the Appeals Council incorporates new and material evidence into

the administrative record, but denies review of the ALJ's findings and conclusions, the

inquiry before the reviewing court is whether the Commissioner's decision is supported

by substantial evidence in light of "'the record as a whole' including any new evidence that

the Appeals Council 'specifically incorporated ... into the administrative record.'" *Meyer*

*v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (quoting *Wilkins v. Sec'y, Dep't of Health and*

*Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)); *see also Snider,*

2013 WL 4880158, at *5 ("[W]here a claimant has submitted additional evidence to the

Appeals Council, and the Appeals Council considered that evidence and made it part of

the record, this Court must review the record as a whole, including the new evidence, to

determine whether substantial evidence supports the Commissioner's findings.").

New and material evidence does not automatically require remand, and certainly

not simply because the ALJ never reviewed the evidence. Instead, the question is whether

the lack of additional fact-finding pertinent to the new evidence "render[s] judicial review

'impossible'" because the record no longer provides "an adequate explanation of [the

Commissioner's] decision." *Meyer,* 662 F.3d at 707. In *Meyer,* the United States Court of

---

[3] The regulation was amended effective January 17, 2017 to add provisions that post-date the Appeals
Council's consideration of Claimant's request for review and are not relevant to the issues in dispute.

Appeals for the Fourth Circuit provided examples of when new and material evidence would or would not require remand. *Id.* For example, when the new evidence was generated by a treating physician, provided additional opinions not controverted by other evidence in the record, and constituted the only opinions of the treating physician, remand was generally required. *Id.* On the other hand, if substantial evidence supported the ALJ's decision, even when factoring in the new evidence, remand was unnecessary. *Id.*

Given the scope of judicial review in social security disability cases, "District Courts have limited the applicability of *Meyer* to those cases where an evidentiary gap exists in the medical record," which is filled by the new and material evidence. *Meadows v. Berryhill*, No. 516CV00068RJCDSC, 2017 WL 4534771, at *4 (W.D.N.C. Oct. 11, 2017). Consequently, the reviewing court must "focus on determining whether [the] new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.' Where no such conflict is present, the case can be decided on the existing record without remand." *Flesher v. Colvin,* No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) *(*quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013)); *see, also, Yost v. Astrue*, No. CIV. A. TMD-08-2942, 2010 WL 311432, at *3 (D. Md. Jan. 19, 2010) ("[W]hile evidence considered by the Appeals Council must have been found to be "material", *i.e.* a reasonable possibility that it would have changed the outcome, that alone clearly does not necessitate a finding at the district court level that the case be remanded. Rather, at this juncture, the Court's role is to determine whether the record, as whole (including that evidence considered by the Appeals Council), supports the Commissioner's findings.") *and Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015) (holding that the

48

"touchstone of the ... analysis [is] whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'"). Put simply, if the new evidence "is not in blatant contradiction with and does not cast serious doubt upon the original evidence reviewed by the ALJ, then remand is unnecessary if the ALJ's decision is supported by substantial evidence." *Shuman v. Berryhill*, No. 3:16-CV-62, 2017 WL 3476972, at *5 (N.D.W. Va. Aug. 14, 2017) (citing *Flesher*, 2016 WL 1271511, at *9–10).

Starting with the examination and RFC assessment of Mr. Reeser, a licensed psychologist, the undersigned **FINDS** that this new and material evidence provides no basis for remand. Indeed, Mr. Reeser's diagnostic impressions are entirely consistent with those of Jeffrey Boggess, Ph.D., and Rachel Arthur, M.A., agency consultants whose findings and opinions were given some weight by the ALJ. (Tr. at 25). Like Ms. Arthur, Mr. Reeser found Claimant to have major depressive disorder, recurrent episode, mild; alcohol use disorder, mild; and unspecified anxiety disorder. (Tr. at 431, 598). Similarly, Dr. Boggess assessed Claimant with anxiety disorder and substance addiction disorder. ((Tr. at 212). Consequently, Mr. Reeser's examination did not uncover any psychiatric disorder not already considered by the ALJ in determining Claimant's RFC.

With respect to mental function assessments, the record contains three opinions when including Mr. Reeser's RFC findings. Two agency consultants, Dr. Boggess and Dr. Smith, completed Psychiatric Review Techniques in 2013 and 2014, respectively, and concluded that Claimant's psychiatric symptoms were not severe, created no more than mild restrictions in the four broad functional categories, and were well-controlled on medication. (Tr. at 224, 386). In contrast, Mr. Reeser opined that Claimant's depression and anxiety caused more severe limitations in his ability to do work-related activities. In

particular, Mr. Reeser felt that Claimant had marked limitations in understanding, remembering, and carrying out complex instructions, and extreme limitations in making complex work-related decisions. (Tr. at 599). However, Mr. Reeser further determined that Claimant had no limitations in carrying out simple instructions and making simple work-related decisions, and only a mild limitation in remembering simple instructions. (*Id.*). As far as Claimant's ability to interact with others, Mr. Reeser opined that Claimant had moderate limitations in dealing appropriately with supervisors and co-workers and marked limitations in dealing with the general public. (Tr. at 600). In assessing Claimant's RFC, the ALJ did not have access to Mr. Reeser's opinions, but relying on the medical evidence and Claimant's statements, found that Claimant's psychiatric symptoms caused him to have greater limitations than appreciated by Dr. Boggess and Dr. Smith. More closely aligned with Mr. Reeser's opinions, the ALJ found Claimant limited to work requiring only simple instructions and only occasional interaction with others. (Tr. at 20). Thus, rather than blatantly contradicting or calling into serious doubt the ALJ's decision, the materials submitted by Mr. Reeser serve to substantiate the ALJ's mental RFC finding.

Looking next at Dr. Craig's report and RFC assessment, the undersigned again **FINDS** no basis to remand the ALJ's decision based upon this new and material evidence. In the report, Dr. Craig states that he examined Claimant and reviewed medical evidence in order to provide opinions regarding Claimant's work-related limitations. However, as the report fails to include any findings from Dr. Craig's physical examination of Claimant, it does not present new, contradictory, or competing information that undermines the physical findings considered by the ALJ. Moreover, when reaching his opinions, Dr. Craig relied heavily on Claimant's 2011 and 2013  MRI's of the spine, which showed significant degenerative changes and spinal stenosis. That medical imaging was available to the ALJ

and the agency consultants and was analyzed by all of them. As such, Dr. Craig's report does not fill any evidentiary gaps.

Dr. Craig also prepared a physical RFC assessment wherein he found Claimant incapable of anything more than "sedentary to very light levels" of activity, (Tr. at 602-04), although this opinion was not supported by specific facts or concrete explanation. Furthermore, he found Claimant (1) incapable of performing any postural activities, other than partially stooping on rare occasions; (2) limited in his ability to reach, push, and pull; and (3) "completely unable to work in an industrial environment" due to "physical limitations and safety issues." (Tr. at 604-05). Dr. Craig concluded that "[t]here is no possibility that [Claimant] will ever again be able to work an 8 hour per day, 5 day per week job." (Tr. at 602).

Although Dr. Craig's RFC opinions clearly conflict in significant ways with those of the ALJ and the agency consultants, remand is not required simply because differences of opinion exist. Instead, the undersigned looks at whether Dr. Craig's materials fill an evidentiary gap or cast into serious doubt the information relied upon by the ALJ, such that the court cannot adequately assess the ALJ's decision under the current record. Here, Dr. Craig relied on the same medical evidence examined and relied upon by the ALJ and the agency consultants, with the exception of Dr. Craig's physical examination. However, as Dr. Craig did not document the findings from his examination of Claimant, no new objective evidence was introduced into the record, and certainly none which differed from that already present in the record. Moreover, as the opinions expressed by Dr. Craig regarding Claimant's RFC essentially mirror statements repeatedly made by Claimant, no new functional limitations were suggested that were not already considered and explicitly discounted by the ALJ. As such, all that remains is for the court to determine if the ALJ's

decision is contrary to the weight of the evidence currently of record.

The undersigned **FINDS** that even when adding Dr. Craig's opinions to the mix, the ALJ's decision is not contrary to the weight of the evidence. The ALJ acknowledged the disabling limitations alleged by Claimant, but found them to be exaggerated. In reaching that conclusion, the ALJ did a thorough and comprehensive analysis of the evidence. The ALJ recognized that Claimant had documented severe degenerative changes of his spine, as well as COPD and symptoms of alcohol abuse. Nonetheless, the ALJ rejected assertions that Claimant was totally precluded from work-related activities. (Tr. at 25). Given that a claimant's RFC and his status as disabled or not disabled are administrative decisions reserved to the Commissioner, Dr. Craig's opinions on these issues would be considered, but would not be entitled to any special weight. As stated, Dr. Craig was not a treating physician; he presented no new objective findings; and his opinions did not fill any evidentiary gaps. Instead, Dr. Craig merely restated the work-related limitations reported by Claimant, which the ALJ expressly rejected based upon other substantial evidence. Therefore, the current record provides an adequate explanation of the Commissioner's decision, and that decision is not contrary to the weight of the evidence currently of record.

To the extent Claimant argues that remand is required, because the Appeals Council failed to explain its analysis of the new and material evidence, such an argument is without merit. Social Security regulations simply "do not require the Appeals Council to articulate its rationale for denying a request for review." *Meyer,* 662 F.3d at 705-06. As long as the record before the court provides an adequate basis on which to evaluate the Commissioner's decision (i.e. the new evidence does not fill an evidentiary gap that played a role in the ALJ's decision—thus requiring fact-finding, weighing, or reconciling), the

lack of an explanation by the Appeals Council is not determinative of the need for remand. *See, e.g., Clevenger v. Colvin*, No. 2:16-CV-14, 2016 WL 6236316, at *4–5 (N.D.W. Va. Oct. 25, 2016). In this case, the undersigned **FINDS** that the reports and assessments provided by Mr. Reeser and Dr. Craig do not fill an evidentiary gap, nor prevent this Court from conducting a substantial evidence review. Furthermore, the undersigned **FINDS** that the Commissioner's decision is supported by substantial evidence even when considering the new and material evidence as part of the record.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, (ECF No. 13); Defendant's motion for judgment on the pleadings as articulated in her brief in support of Commissioner's decision be **GRANTED**, (ECF No. 14); the final decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED**, with prejudice, and removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 26, 2017

Cheryl A. Eifert
United States Magistrate Judge